# THE BOARD OF SUPERVISORS OF KANE COUNTY *et al.*

## *v.*

# AUGUSTUS M. HERRINGTON *et al.*

1. RESULTING TRUST—*what constitutes—minor heirs.* Where the owner of a claim to government land, sold a portion of his claim to another, and the vendee in consideration thereof, agreed to pay to the government the money necessary to secure the remaining interest in such claim to his vendor, and the money was paid, but before it was paid the vendor died, the money so in the hands of the vendee, was held in trust for the heirs of the vendor, and when applied to the purchase of the remaining interest in the land, the equitable interest of the heirs in the money, attached to the land, and an estate in trust, in favor of the minor heirs resulted therefrom.

2. SAME—*statute of frauds.* Resulting trusts are not embraced in the statute of frauds, but only express trusts, resting in parol, or other verbal agreements for the sale of lands, are within the purview of the statute.

3. ESTOPPEL—*minor heirs—notice of title.* Where property, in which minor heirs have an equitable interest, is being improved by the party claiming the legal title, they are not bound to give notice of their rights, and would not be estopped because of their failure to do so ; for, as minors, they are not capable of estopping themselves, simply by failure to assert title.

4. SAME—*acquiescence in the acts of others.* If persons who have an equitable claim to real estate, assent to, and acquiesce, in acts performed in relation to such estate, by one holding the same in trust for the equitable claimants, such acts of the trustee being inconsistent with their equitable rights, they, by such assent and acquiescence, will be estopped from afterward asserting their equitable claim.

5. STALE CLAIMS—*in chancery.* The time in which equitable claim to realty should be asserted, is controlled by the analogies of the law ; and, if twenty years are allowed to elapse, after the statutory disability of the claimant ceases, without asserting such claim, he is thereby placed without the pale of chancery relief.

6. TENANT—*whether estopped from questioning his landlord's title.* As a general rule, a tenant is estopped from questioning his landlord's title, when sued for possession. But, when upon eviction under a paramount outstanding title, he has attorned to the true owner, he is not estopped from setting up the eviction, and the title under which the eviction was had, as against the claim of his lessor.

7. So, also, when the landlord has aliened the demised premises, and sues the tenant in ejectment, the tenant may defeat the recovery by setting up the conveyance.

8. But, as in this case, where a party holding the equitable title to real estate, takes a lease from the party holding the legal title, the former is not estopped from asserting his equitable title as against his lessor, the latter being left, precisely, and in every particular, in the same position he was, before the leasing, having incurred no further, other, or greater liability in regard to the premises in controversy.

9. ARBITRATION—*when not voidable.* The regularity of the proceedings in a submission to arbitration cannot be questioned, where by long acquiescence, it has acquired such force, that the parties in interest would be held to its terms.

10. So, where a bill in chancery, to compel a conveyance of certain premises, was filed Feb. 5, 1864, the defendants cannot set up any irregularity in the proceedings in a submission to arbitration, which occurred June 5, 1838, to defeat the claimants' title to any portion of the premises in controversy.

11. DISCLAIMER—*by part of the heirs—rights of the other claimants.* In a suit in chancery, brought by heirs, a disclaimer by one or more of the heirs, to any interest in the premises in controversy, does not vest the interest so disclaimed in the remaining heirs.

12. DESCENT—*of land purchased after the death of one of the heirs.* A owned a claim to government land and sold a portion of his claim to B, in consideration that B would pay the government a sum sufficient to secure the title to the remaining portion in A. Afterwards A died, and the purchase by B was made and perfected after his death; *Held,* that B held the money in trust for the heirs of A, and that by a subsequent payment of the money to the government, the equitable interest of the heirs in the money, attached to the land, and an estate in trust was thereby created. But after the death of A, and before the money was paid by B to perfect the title in the heirs of A, to the remaining portion of his claim, one of the heirs died: *Held,* that such heir having died before the money so in the hands of B passed into the land by the subsequent purchase, did not have an estate of inheritance in such purchase, that could pass by descent to his heirs.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge presiding.

This was a bill in chancery, exhibited in the Kane County Circuit Court. The cause was removed by a change of venue to the Superior Court of Chicago. The bill was filed February 5, 1864, and upon the hearing a decree for the complainants

was entered.   The defendants below bring the cause to this court.      The further facts in this case are fully stated in the opinion.

Messrs. GOOKINS & ROBERTS, for the appellants.

Messrs. MILLER, VAN ARMAN & LEWIS, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

The widow and heirs of James Herrington, deceased, filed their bill in the Kane Circuit Court, against the board of supervisors and others, as officers and agents of the county, to enjoin a sale and compel a conveyance of lots 9 and 10, in block 52, in the town of Geneva.   It appears that the lots had been for many years used for county purposes, and on which a court house, jail and recorder's office had been erected.   The bill alleges that the county holds the property in trust for complainants, and seeks to have the trust executed by a conveyance.

The bill alleges that one Haight, in the year 1835, settled on the quarter of land, of which the lots in controversy are a part, and that the land was then unsurveyed; that he sold his claim to Herrington, the ancestor of complainants, who went into possession and resided on it until his death, which occurred in 1839.   After his death his widow and heirs continued to reside on a portion of the tract; in June, 1836, Herrington sold an undivided three-fourths of his claim, excepting two acres on which his house stood, to one Hamilton, who afterwards sold different portions to various persons; in June, 1836, the commissioners appointed for the purpose, located the county seat on this claim; that Herrington and Hamilton laid out the village of Geneva on this claim, and recorded the plat; proceedings were instituted in the Kane Circuit Court for the purpose of obtaining partition among the several claimants of the property; this proceeding was commenced at

the May term, 1840, of the circuit court, and Daniels, Hamilton and Madden were plaintiffs, and Herrington was defendant. From these proceedings it appears that on the 5th of June, 1838, these parties entered into an arbitration bond, by which King, Hubbard and Dunham were chosen to arbitrate, award, order, appraise, divide, and set apart and determine the parts of the town of Geneva to which the parties, and those claiming under them, were entitled. Herrington's two acres, and certain other portions of the property, including that in controversy, were excluded from the submission, and reserved to Herrington.

In 1840, the lands in that section of the State having been surveyed, it was found that the tract upon which the county seat had been located, was the south-east quarter of section 3, township 39, range 8. This land was purchased by the county in 1841, the complainants furnishing their share, and other persons interested, the residue of the purchase money, they holding the equitable, and the county the legal title to the quarter.

The answer denies that complainants had a pre-emption right; admits Herrington's death and the heirship of complainants; insists that the county was not bound by the arbitration proceedings, as they were void, because the county, nor its grantor, were parties to it; because the government then owned the land; admits the laying out of the town, and the purchase by the county in 1841, but denies that complainants then claimed any interest in the land, or furnished any portion of the purchase money; that by general consent of the citizens, who furnished the purchase money to enter the land, there was conceded to Mrs. Herrington the interest which her husband claimed in the property in 1838, on her paying the cost and expenses, pursuant to which understanding the county has, from time to time, conveyed to her, or to others on her request, her share, all of which had been done prior to 1854.

That in 1837–8 a court house and jail were erected, on 41 and 43, where they continued until 1843, at which time, owing

to the principal settlement of the town being along Fox river, and the desire of the citizens for their removal, their location was changed. Mrs. Herrington then occupied block 53, when it was agreed between her and the county, that in lieu of any interest she had in the lots in controversy, she should take lots 1 and 2 in block 51, which arrangement was carried into effect, and the county proceeded to erect the court house, jail and recorder's office on the lots in controversy; that these buildings were used by the county until in 1858, when new county buildings were erected in another locality, to which the county records were removed; that Augustus M. Herrington, on the removal of the county records, took a lease of the recorder's office for three years, at a rent of $40 per annum, conditioned, that should the property be sold, he would render possession; that the county owned lots 1 and 2 in block 51, in fee, and they so remained until 1853, when on the written request of Mrs. Herrington, they were conveyed to complainant, James Herrington. It is alleged that complainants knew the facts, and recognized the right of their mother to contract and dispose of the property, and knew of the conveyances made on her orders, and to which they never interposed any objection; that James still claims lots 1 and 2 in block 51, and has never offered to reconvey them. The answer relies upon an estoppel *in pais* by the various acts of complainants, also upon possession for over twenty years, and the staleness of complainants' claim.

It appears that Mrs. Tuthill, one of the heirs, and her husband, entered a disclaimer of any claim to any interest in the land, and the bill was dismissed as to them, by an order of the court. The evidence also discloses that Herrington, in his life time sold an interest in some water power situated on his claim, to one Strode, and he, by a written contract then executed, agreed to advance the money necessary to pay the government for Herrington's fourth of the quarter. Strode afterwards sold his claim to Sterling, who obligated himself to pay that amount for the entry of the land, and he testifies

that he did pay the necessary sum to Fletcher for the purpose, and the latter swears that he used it in entering the land. Thus it is seen that the money used for the purchase of the Herrington interest was due to the estate, and in which the heirs had an equitable interest, and it was applied to the purchase of a claim and improvements held by their father at the time of his death.

And as the money to which the heirs were equitably entitled was employed in purchasing the land and improvements upon which their father lived, at the time of his death, the equity in the money attached to the land, and as their money paid for the land, without their consent, they being minors and incapable in law of consenting, the law implied a trust which resulted in their favor when the land was purchased, and the county became their trustee, and this trust was fully recognized by the county in reference to this as well as other interests, when Fletcher was appointed as the agent of the county to make deeds of conveyance on behalf of the county, so as to vest in these, and other beneficiaries, the legal title. And he supposing that Mrs. Herrington had the legal right to control this interest, at various times made conveyances to different persons on her request, who no doubt thus acquired title, unless chargeable with notice of the equitable interest of the heirs.

The heirs, then, having become vested with this interest as a resulting trust, the statute of frauds could not avail, even had it been relied on in the pleadings. It has been repeatedly held that such trusts are not embraced within the statute, but only express trusts resting in parol, and other verbal agreements for the sale of lands, are within the purview of the statute. It then follows that these complainants were, in equity, entitled to the portion of the lands awarded to Herrington, and the lots in controversy are a part thereof, unless they have done some act which has divested them of their title, or which has estopped them from its assertion.

LAW SCHOOL LIBRARY

Those who were minors could not be estopped by reason of their failure to give notice to the agents of the county that they claimed interests in the property while the county buildings were being erected. In law they were not capable of estopping themselves simply by failing to assert title. The county being the trustee, is presumed through its agents to have known the character of the title, and the record shows it did know, as the order, which was entered of record by the county commissioners, authorized Fletcher to convey lots 1 and 2 in block 52, to Mrs. Herrington, upon her filing with him a sufficient lease of all her interest, or such as the heirs of Herrington might have to lots 9 and 10 in block 52, and the order states that it was entered at the request of Mrs. Herrington. By this order the county authorities admit that the heirs had an interest in the lots in controversy, and requires their agent to extinguish it before he conveyed lots 1 and 2. Thus it appears the county authorities acted upon full information that the heirs had an interest in these lots, when they erected these buildings, nor have they shown that a release of that interest was ever acquired from the heirs.

It is urged that the arbitration was inoperative, as Herrington had died before it was published and became a matter of record. We do not conceive that it was material that it should have been binding on the parties at the time, as by long acquiescence it has acquired such force that the parties in interest would be held to its terms, and such would be the effect of a parol agreement after such an acquiescence. Moreover, none of the parties whose interests were affected by it are now complaining of its terms or provisions. Nor do we see that the county has any right to question the validity of the arbitration, as they had previously recognized the heirs and their mother as having all of the equitable rights that existed to these lots.

Nor, as urged by counsel for appellant, can the claim be regarded as stale. Twenty years have not elapsed since all the heirs have come of age, and unless the suit would have

been barred had the action been at law, it cannot be held to be stale. If, however, any portion of the heirs were of age when the county entered into possession, and twenty years have elapsed before this suit was brought, then the result would be otherwise, as to such heirs. Where the statute of limitations would bar an action at law, and the matter is litigated in chancery, the latter tribunal, following the analogies of the law in such cases, would hold the claim to be stale, and refuse the relief sought.

We think that the evidence in this record proves that the county gave, or agreed to give, lots 1 and 2 in exchange for lots 9 and 10, and all of the complainants who were of age at that time and assented to the arrangement, are estopped from claiming any interest in this property. And those who have dealt with lots 1 and 2 as their own, or as belonging to the heirs, are likewise estopped. It then follows that Mrs. Herrington, by directing these lots to be conveyed to James, and he by receiving the conveyance and appropriating them to his own use, were estopped from claiming any right to the lots in controversy.

If A. M. Herrington was of age, as is contended, when the lots were exchanged, he may have so acted as to be estopped from now asserting title. We have seen that his mother acted with the property as though she held the equitable title, or at least as though she was the agent fully empowered by the heirs to sell and dispose of the property. And if he was of age, knowing that his mother was so acting, we may presume those acting for the county believed she had the right to control the equity, and that by the exchange the county were uniting the equity with the fee, which it held. Having reason to believe that the county was thus acquiring the equity, and he knowing that his mother claimed to have power to release and dispose of the equity to those lots, it became his duty to assert his claim and thus give notice to the county agents, that they might have avoided the large outlay incurred in these improvements. If not under disability, he should then

have given the notice, and failing to do so, it would be inequitable to permit him now to assert his title. Had the county taken possession without the arrangement made with Mrs. Herrington, it would, no doubt, have been otherwise.

As to whether A. M. Herrington occupied the recorder's office under a lease from the county, there seems to be a conflict of testimony. He swears positively that he did not lease it of the county, and his brother James says he refused to lease it, but having been ordered by the board to lease it to his brother, on terms named in the order, he afterwards reported that he had leased it as required. On the other hand, Vining and Brown, members of a committee appointed by the board of supervisors to confer with him, says, that he offered to pay thirty dollars per year for a lease, and it appears that it was upon their report that the order for the lease was made. But conceding that he did take the lease, it does not follow he would be estopped to assert his equitable title. As a general rule, a tenant is estopped from questioning his landlord's title, when sued for possession ; but to this rule there are some exceptions—as where the tenant has been evicted by a paramount outstanding title, and has attorned to the true owner, he may, when sued by the person from whom he leased, show the eviction and set up the title under which the eviction was had.

In such a case the eviction under a paramount title terminates the former relations existing between them. So, if the landlord aliene the demised premises and sues the tenant in ejectment, the tenant may defeat a recovery by showing the conveyance.

Again, a party may estop himself by permitting other persons, with his knowledge and assent, or encouragement, to purchase property which he owns, and thus to expend their money, without notice. In such a case it is held to be a fraud, that estops him from afterwards asserting title. In taking this lease there was nothing done which induced the county to expend money or incur liability, but the county was

left in every particular precisely as it was before. Had the county erected buildings afterwards, or had a person purchased of the county on the supposition this lease created of ownership in the county, then it would fall within the cases referred to in appellants' brief.

Mrs. Tuthill and husband having disclaimed any title to the premises, it follows that the other claimants would have no right to her share, and any decree giving it to them would be erroneous. Nor can the other complainants claim the interest of those who have been estopped from claiming any portion of these lots.

It is insisted that one of the heirs having died, his interest was inherited by the mother and brothers and sisters, and that Mrs. Herrington, if entitled to any interest in the property, was entitled to an equitable fee in the share of that child, and that the decree finds no such interest. If we understand the evidence correctly, that heir died soon after the father, and before the purchase of the land, and if so, that heir had no interest in the land at the time of his death, and by no known principle of law could any subsequent interest be vested in a deceased person.

The decree of the court below is reversed and the cause remanded.

*Decree reversed.*